## AFFIDAVIT OF SPECIAL AGENT CRAIG HARVEY IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

Your affiant, Craig Ryan Harvey, being duly sworn, deposes and states:

### Introduction and Agent Background

1.  I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been so employed since July 2018. I am currently assigned to the Boston Field Office, North Shore Gang Task Force ("NSGTF"). Prior to July 2018, I was employed as a SA with the United States Army Criminal Investigation Command since November 2013. During that time, I received training and experience in a variety of investigative methods to include interview and interrogation, arrest procedures, search and seizure, forensic interviewing techniques, and crime scene processing. Additionally, since my employment with the FBI began, I have received additional training and experience in interviewing and interrogation, arrest procedures, search and seizure, gangs, narcotics, search warrant applications, and various other investigative techniques and methods. As part of the NSGTF, I have focused my efforts on the North Shore and Boston Chapters of the Almighty Latin King and Queen Nation ("ALKQN"). In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies, as well as traditional gang methodologies and structures.

2.  This affidavit is made in support of an application for authorization to search a black ZTE cell phone with serial number 329775308427 ("TARGET PHONE") which is currently in the custody and being maintained by the Malden Police Department, 800 Eastern Avenue, Malden, MA 02148. As set forth below, I believe that the TARGET PHONE, more particularly described in Attachment A, is likely to contain evidence of a crime, described more fully in

1

Attachment B, specifically, violations of Title 18 United States Code, Section 922(g) and Title 21, United States Code, Sections 841(a)(1) and 846.

3. The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show that there is sufficient probable cause for the requested search warrant and does not set forth all of my knowledge about this matter.

## Probable Cause

4. On November 3, 2018, the NSGTF executed a search warrant at the apartment of ALBERTO JUNIOR LOPEZ, located at 94 Eastern Ave., Apt #8, in Malden, Massachusetts. Although LOPEZ was not home at the time the warrant was executed, items found inside the apartment provided strong evidence that LOPEZ resided there and specifically, that one of the bedrooms belonged to him. The other bedroom was later identified as belonging to CARLOS FIGUEROA.

5. The items seized from the bedroom believed to belong to LOPEZ include: (1) certain items of clothing and a distinctive pair of Nike shoes that law enforcement had, on a previous date, observed LOPEZ wearing, along with personal items clearly belonging to LOPEZ; (2) a Louis Vuitton wallet containing LOPEZ's identification and credit cards, along with paperwork addressed to LOPEZ, in the bedroom nightstand; (3) two firearms, a loaded Glock .45 caliber compact firearm and a Colt .45 caliber firearm with an obliterated serial number; (4) a Smith & Wesson high capacity magazine and two Glock magazines; (5) more than 80 rounds of assorted ammunition; (6) a magazine containing 6 rounds of .45 caliber ammunition found in a Honeywell lockbox in the bottom drawer of the bureau; (7) approximately 64 grams of heroin and 100 grams of crack cocaine; (8) and more than $4000 in U.S. currency found throughout the

bedroom, including ten (10) money stacks ($181, $304, $219, $169, $$112) found in a red Bally's shoebox on the floor of the closet.

6. The items seized from the bedroom believed to belong to FIGUEROA include: (1) three Motorola radios; (2) a black ZTE cellphone (the TARGET PHONE); and (3) a black and yellow Latin King ("LK") patch.

7. In the kitchen, law enforcement found: (1) approximately 11 grams of heroin and 27 grams of crack cocaine in a kitchen drawer; (2) approximately 34 grams of cocaine on the top shelf of the refrigerator; (3) two digital scales and two boxes of Glad sandwich bags also on the top shelf of the refrigerator; and (4) paperwork in name of Elvin LOPEZ (later determined to be a cousin of ALBERTO JUNIOR LOPEZ and a previous resident of apartment #8).

8. Law enforcement also found acetone, borax, bleach, a gas mask and plastic gasoline cans in the hallway closet where the HVAC is located. Based on my training and experience, I know that these are items which are commonly used to convert cocaine hydrochloride into cocaine base or crack cocaine.

9. While the warrant was being executed, officers posted outside observed a black SUV pull up in front of the entrance to the apartment building. A female driver who was operating the SUV stopped and two males exited from the backseat.

10. The first individual was a Hispanic male with a salt and pepper beard wearing a red sweat shirt, jeans and a dark colored baseball cap. That individual walked to the front door and opened it. Malden Police Officer McNeal watched as the male entered the front door at which point he stopped him from continuing beyond the threshold and asked his identity and why he was at the apartment that day. The male stated that his name was "Carlos" and that he was going to "Apartment 8." At that time, Carlos, later identified as Carlos FIGUEROA, was placed into

3

handcuffs for officer safety due to information obtained by law enforcement that the subjects might be armed and dangerous.

11. As officers conducted a pat down of FIGUEROA, Detective Montino felt a hard object in his waistband that he believed to be a firearm. Officers then removed a loaded Smith & Wesson, .45 caliber Springfield Model #1911 handgun from FIGUEROA's waistband, cleared and secured it. At that time, FIGUEROA stated: "that's not mine…the other guy gave it to me to hold for me, he placed it on my waist."

12. FIGUEROA was subsequently interviewed by Task Force Officers (TFO) DiSalvatore and Impemba. The interview was audio and video recorded at the Malden Police Department. FIGUEROA was read his Miranda rights which he waived and signed a waiver form acknowledging that he understood his rights and was agreeing to speak to law enforcement. FIGUEROA admitted that he lived at 94 Eastern Ave, #8 with Alberto LOPEZ. According to FIGUEROA, Alberto moved into the apartment in September 2018 after Elvin LOPEZ moved out. FIGUEROA claimed not to have a lot of interaction with Alberto LOPEZ. FIGUEROA was informed that police had found numerous firearms and illegal narcotics in the apartment, to which FIGUEROA responded that those items were all Alberto's. When he was told that a large quantity of heroin and crack cocaine had been found inside a kitchen draw, a common area of the apartment, FIGUEROA again stated that the drugs were not his and that they belonged to Alberto.

13. FIGUEROA was then asked about what had happened when he had arrived home that morning. He advised that he had been partying at a house in Chelsea with Alberto and another person he called "Crisco," later identified as Francisco DIAZ.[1] FIGUEROA got a cab with Crisco and they headed to 94 Eastern Avenue. FIGUEROA claimed that when he was in the cab with

---

[1] DIAZ was stopped by law enforcement down the street from 94 Eastern Avenue and arrested after it was determined that there was a warrant out for his arrest and that he was in possession of crack cocaine.

Crisco, he saw that Crisco had a firearm in his waistband. According to FIGUEROA, when they got to Malden, they exited the cab and approached the front of 94 Eastern Ave. When Crisco saw the police officers, he pulled out the firearm he was carrying and stuck it in FIGUEROA's waistband. Crisco told him that he had warrants and that he was going to run and the cops would chase him, at which time FIGUEROA could just walk away. When the police approached, FIGUEROA said he panicked and just stopped and put his hands behind his back.

14. The firearms seized pursuant to the search warrant at 94 Eastern Ave., Apt #8, in Malden along with the firearm seized from FIGUEROA were sent to the lab to determine if any were used in a September 6, 2018 shooting in Revere (described in paragraph 16 below). On January 4, 2019, I received verbal confirmation that ballistics tests matched a bullet casing found at the Revere shooting scene to one of the firearms seized from LOPEZ's bedroom and another casing matched the firearm taken off FIGUEROA's person at the time of his arrest. Nexus examinations determined that the firearms and ammunition all traveled in interstate or foreign commerce.

15. Field tests conducted on the drugs found inside the apartment were positive for heroin or cocaine base. The drugs are currently at the lab for testing and the results are being expedited but, as of this date, are still pending.

16. As stated in paragraph 14 above, on September 6, 2018, at approximately 9:46pm, patrol units from the Revere Police Department responded to the area of 112 Constitution Ave. Revere, MA for a report of shots fired. Witnesses described hearing gun shots and observing a two-door coupe and a four-door sedan fleeing from the area. Officers located one spent round of ammunition under a nearby parked car.

17. On September 7, 2018, Revere detectives were able to view video surveillance from one of the Housing Authority cameras in the area. The video surveillance footage depicted several

individuals, including two unidentified shooters, standing directly in front of 311-313 Cooledge Street at approximately 9:47 pm. It was apparent that the two shooters were firing at a passing motor vehicle, possibly a Mercedes Benz. One of the shooters was wearing jeans, sneakers and a black hooded sweatshirt with the hood up. The second shooter was wearing black sweatpants with white stripes down the leg area, a black hooded sweatshirt with the hood up, a white t-shirt underneath, and a very distinct pair of black and white sneakers with a striped zebra like pattern on the side. The shooters could be seen on video standing in front of 311-313 Cooledge St. as they fired their weapons multiple times in the direction of a passing vehicle. After viewing the video, detectives went to the area where the shooting had occurred and recovered eleven (11) .45 caliber shell casings from the front lawn and sidewalk area of 311-313 Cooledge St.

18. Later, detectives were able to scrutinize the video more carefully and TFO Impemba identified one of the individuals seen on the footage (although not one of the shooters) as Ahkeem Tucker, a/k/a "Kimbo" who resides at 305 Cooledge St. TFO Impemba has known Tucker, a self-admitted member of the Cooledge Street Project (CSP) street gang, for approximately twelve years. Tucker has had regular involvement with the Revere Police Department.

19. A couple of weeks after the shooting, on September 24, 2018, Ahkeem Tucker was arrested on an unrelated matter. While Tucker was being arrested, Hector Diaz, a/k/a "Pretty Flacco," self-admitted member of the Almighty Latin King and Queen Nation (ALKQN), arrived on scene. Diaz informed the officers that he was there to take possession of Ahkeem Tucker's motor vehicle.

20. During further review of the video footage from the September 6, 2018 Revere shooting, Hector Diaz was identified as one of the other individuals seen on the footage with Ahkeem Tucker, although also not one of the shooters.

21. On October 5, 2018, TFO Impemba and other officers were at Chelsea District Court on an unrelated criminal matter. While inside of the courthouse, TFO Impemba observed Ahkeem Tucker and Hector Diaz sitting in Courtroom #1 with a third unidentified male. The unidentified male was wearing black running pants, a black hooded sweatshirt, and what appeared to be the same very distinct pair of black and white Nike sneakers with the striped zebra-like pattern worn by one of the shooters on September 6, 2018. While observing this individual, TFO Impemba saw Tucker, Diaz and the unidentified male approached an individual from another gang outside one of the courtrooms and an altercation ensued. As Court Officers attempted to intervene in the altercation, the Revere officers assisted in escorting Tucker, Diaz and the third male out of the courthouse. Once outside, TFO Impemba approached the unidentified male and asked his name, to which the unidentified male stated "I don't have a name." At this point, TFO Impemba took a digital photograph via cellular phone of the unidentified male which made him extremely angry. The photograph depicts the male's entire body, including his black hooded sweatshirt with gold Nike emblem, his black sweatpants with white Nike emblem and white stripes down the leg and his distinct black and white Nike striped zebra sneakers.

22. Through the use of social media and other investigative efforts, detectives were able to identify this individual as Alberto Junior LOPEZ. A vehicle registration query identified LOPEZ as the registered owner of a 2013 blue Mercedes. Thereafter, TFO Impemba spoke with a Confidential Informant ("CI")[2] who informed him that one of the individuals seen on the surveillance video firing a gun, who was wearing the black sweatpants, black hooded sweatshirt, and zebra patterned sneakers, was the person TFO Impemba had photographed outside Chelsea

---

[2] This CI has assisted TFO Impemba in numerous investigations over the past 15-18 months which have resulted in the location of individuals with outstanding arrest warrants, the seizure of numerous firearms and controlled drug buys resulting in numerous arrests, two convictions and two indictments of various targets/defendants.

District Court. It was this identification of LOPEZ that provided probable cause for the state search warrant at 94 Eastern Ave., Apt #8 in Malden executed on November 3, 2018.

23. FIGUEROA is believed to be a member of ALKQN based on his Suffolk County prison record. LOPEZ is also believed to be an ALKQN member, and his uncle is Francisco Lopez, a high ranking member of the Latin Kings. As stated above, during the execution of the November 3rd search warrant, a Latin Kings patch was found in the bedroom believed to belong to FIGUEROA.

24. There are numerous factors which lead me to believe, based on my training and experience, that evidence of violations of Title 18, United States Code, Section 922(g), and Title 21, United States Code, Sections 841(a)(1) and 846 will be found on the TARGET PHONE. These factors include (1) FIGUEROA's criminal history, which includes convictions for firearms related offenses, including armed robbery, and drug trafficking related offenses, (2) FIGUEROA's possession of a loaded firearm at the time of his arrest on November 3, 2018, (3) the seizure of several firearms and ammunition from FIGUEROA's apartment at the time of the search warrant, (4) the seizure of crack cocaine, heroin, drug trafficking paraphernalia and drug cooking materials from the common areas of FIGUEROA's apartment, (5) LOPEZ and FIGUEROA's shared affiliation and living arrangements, and (6) ballistics evidence matching shell casings from the Revere shooting to the firearm possessed by FIGUEROA at the time of his arrest as well as one of the firearms found in LOPEZ's room.

### Investigators' Possession of the Equipment

25. The TARGET PHONE is currently in the possession of the Malden Police Department and is being stored at its facilities, as described in Attachment A. Investigators obtained the TARGET PHONE during the execution of the November 3rd search warrant.

26. Therefore, while the investigators might already have had the necessary authority

to examine the TARGET PHONE, I seek this additional warrant based on the timing of this request to search the TARGET PHONE and out of an abundance of caution that its search will comply with the Fourth Amendment and other applicable laws.

### Probable Cause to Believe
### The TARGET PHONE Contains Evidence of a Crime

27. From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use cell phones to carry out, communicate about, and store records regarding their daily activities. ZTE phones, such as the TARGET PHONE, are a type of smartphone. These tasks are frequently accomplished through sending and receiving e-mail, instant messages, and other forms of phone or internet based messages; scheduling activities; keeping a calendar of activities; arranging travel; purchasing items; searching for information including information regarding travel and activities; arranging for travel, accessing personal accounts including banking information; paying for items; and creating and storing images and videos of their movements and activities.

28. Based on my knowledge, training, experience, and information provided by other law enforcement officers, I know that many smartphones (which are included in Attachment B's definition of "hardware") now function essentially as small computers. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

29. Based on my knowledge, training, experience, and information provided to me by other agents, I know that data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

    a. Electronic files that have been downloaded to a storage medium can be

stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

33. As discussed above, the equipment is currently being stored at the Malden Police Department. From my training and experience, and the training and experience of law enforcement personnel who routinely handle this equipment, I understand that it has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when it first came into the investigators' possession.

## CONCLUSION

34. Based on the above-described information, there is probable cause to believe that evidence, as more fully described in Attachment B, exists on or in the TARGET PHONE, described more fully in Attachment A, related to violations of Title 18, United States Code, Section 922(g) and Title 21, United States Code, Sections 841(a)(1) and 846, and I therefore seek authority to search for and seize the items described in Attachment B.

*FURTHER YOUR AFFIANT SAYETH NAUGHT.*

Sworn to under the pains and penalties of perjury,

_____
Craig Ryan Harvey
Special Agent, Federal Bureau of Investigation

Subscribed and sworn to before me this ___21st___,
Day of March, 2019
_____
HONORABLE M. PAGE KELLY
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A
### Description of the Item to Be Searched

One (1) black ZTE cell phone, serial number 329775308427, (the TARGET PHONE) currently in the custody of, and located in a secure room at, the Malden Police Department, 800 Eastern Avenue, Malden, MA 02148.





## ATTACHMENT B
**Materials to be Seized**

The items to be seized are stored electronic data and electronic files, including:

a. All records on the TARGET PHONE described in Attachment A that relate to violations of Title 18, United States Code Section 922(g), and Title 21, United States Code, Sections 846 and 841 (a)(1), including:

1. Content such as messages, text communications, e-mails, call logs, pictures, audio files and social media content;

2. Call, email and message data showing time such communications were sent or received and from where and by whom;

3. Content discussing or relating to the commission of illegal activities by CARLOS FIGUEROA, ALBERTO JUNIOR LOPEZ, or unidentified co-conspirators;

4. Data identifying purchases, sales, possession and distribution of controlled substances, firearms and/or ammunition, or the laundering of ill-gotten proceeds from sales of controlled substances, firearms and/or ammunition;

5. Lists of customers, suppliers, and/or criminal associates and related identifying information;

6. Records related to when controlled substances, firearms and/or ammunition were purchased or sold, including dates, places, and amounts;

7. Information related to the location of the TARGET PHONE when used; and

8. Copies of bank records, checks, wire transfers, withdrawals, deposits, credit card bills, bank account information and other financial records maintained in the electronic data of the TARGET PHONE;

b. Evidence of user attribution showing who used or owned the TARGET PHONE from which the electronic information was extracted, at the time when information was created, edited, or deleted, such as logs, phonebooks, usernames, passwords, documents, browsing histories, communications, photographs, text messages and application dates, and including evidence of use with other electronic devices or storage services.

2

  c.  Records evidencing the use of the Internet including:

    i. Records of Internet Protocol addresses used;

    ii. Records of internet activity, including firewall logs, caches, browser history and cookies. "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of use-typed web addresses; and

    iii. Evidence of Wi-Fi networks used.

  d.  As used above, the terms, "data", "records" and "information" include all the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer of electronic storage (such as Subscriber Identity Module (SIM card), flash memory or other media that can store data) and any photographic form.